UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JAMES BLACKMON, et al.,<br><br>　　　　Plaintiffs,<br><br>　vs.<br><br>GLENN TOBIAS, et al.,<br><br>　　　　Defendants. | Case No: C 11-2853 SBA<br><br>**ORDER DENYING PLAINTIFFS' EX PARTE APPLICATION FOR WRIT OF ATTACHMENT AND TEMPORARY RESTRAINING ORDER**<br><br>Docket 4 |

On June 13, 2011, Plaintiffs James Blackmon ("Blackmon") and John Gray ("Gray") filed the instant action alleging claims, inter alia, pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq., against Defendants Jane Andreae ("Andreae") and Glenn Tobias ("Tobias"), among others. The parties are presently before the Court on Plaintiffs' ex parte application for a writ of attachment and temporary restraining order ("TRO"). Dkt. 4. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the ex parte application for the reasons set forth below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

## I. BACKGROUND

### A. FACTUAL SUMMARY

This action arises from an allegedly fraudulent scheme perpetrated principally by Andreae and Tobias (collectively "Defendants," unless noted otherwise). On separate occasions, Defendants told Plaintiffs that they would receive millions of dollars in exchange for helping Andreae pay her legal expenses in a Swiss court proceeding. Specifically, Plaintiffs were told that Andreae stood to receive a $1 billion inheritance once a Swiss court confirmed that she was an heir to the estate of her deceased husband, Peter Andreae, who was a member of a wealthy European family. Andreae's case was supposedly being handled by her advisor, Tobias, who had a power of attorney and lived in Los Angeles. Defendants claimed that Andreae needed to borrow money for legal fees incurred in connection with the Swiss court proceedings, and that if Plaintiffs were willing to loan Defendants money for their legal expenses, Plaintiffs would receive a portion of the estate once the legal proceedings were concluded. See Blackmon Decl. ¶ 6, Dkt. 8; Gray Decl. ¶ 6, Dkt. 6.

Gray fell victim to the above-described scheme, and during 2008 and 2009, loaned monies totaling over $4,654,175 to Defendants. Gray Decl. ¶ 3. Gray made his first payment of $115,000 to Defendants on January 15, 2008, with the understanding that said amount would be repaid by February 1, 2008. Id. ¶ 9. Defendants did not repay Gray, but asked for an additional $45,000, which he wired to them in February 2008. Id. ¶ 10. Once again, Defendants failed to timely repay their debt to Gray, and instead, began offering him a series of excuses for their nonpayment. Id. ¶ 13. Among other things, Defendants told Gray that Peter Andreae's illegitimate daughter was claiming a portion of his estate, and that his body would have to be exhumed and undergo DNA testing in a different country. Id. Thereafter, Gray loaned Defendants an additional $1,105,000 during the time-period from March 10, 2008 to November 2008. Id. ¶ 14.

Apparently becoming suspicious of Defendants, Gray began demanding documentation regarding the Swiss court proceedings and the litigation expenses incurred

by Defendants.  Id. ¶ 17.  Andreae responded by stating that all details of the case had to be kept secret.  Id.  Later in 2009, Andreae called Gray and told him that she had found a key along with a note from her deceased husband stating that the key opened a vault in Liechtenstein which contained cash and gold bars that Andreae suggested could be used to repay him.  Id. ¶ 18.  At Andreae's request, Gray wired her $10,000 to cover the expense of accessing the vault.  Id.  Defendants subsequently informed Gray that there was no cash in the vault, but that there was gold and about a half billion dollars worth of bearer bonds found inside.  Id. ¶ 19.  However, the bonds allegedly were expired and could not be redeemed unless they were included as part of the estate.  Id.  Gray then wired Defendants an additional $1,090,000 in 2009 to pay for legal fees associated with the supposed bond dispute.  Id. ¶¶ 21-22.

Gray continued to complain to Defendants regarding the delays and lack of documentation.  Id. ¶ 23.  In response, Defendants advised Gray that they had located $300 million in gold bars in India that belonged to the estate.  Id. ¶ 23.  They further stated that a "forensic" team needed to go to India to appraise the gold so that it could be included as part of the estate in the Swiss proceedings.  Id. ¶ 24.  To fund these additional activities, Gray wired $2,357,000 to Defendants.  Id.  Thus, as of October 1, 2009, Gray had transferred over $4.6 million to Defendants.  Id.  Eventually, Gray hired a private investigator "in or about 2010" to investigate Defendants.  Id. ¶ 38.  The investigator debuked the version of events conveyed by Defendants to Plaintiffs.  Torgerson Decl. ¶¶ 1-11, Dkt. 7.  He retained legal counsel in July 2010.  Given Decl. ¶ 3, Dkt. 9.

Like Gray, Blackmon loaned Defendants substantial sums of money.  From July 2007 to December 2009, Blackmon paid Defendants the sum of $802,793.49 in exchange for promises of payment in excess of $30 million once the Swiss estate dispute was resolved.  Blackmon Decl. ¶¶ 7, 11, 17.  By the end of 2009, however, Blackmon "was out of money" and "was being hounded by creditors who had loaned [him] money to pay some of the approximately $802,000 in payments [to Defendants]."  Id. ¶ 20.  Defendants made the same excuses to Blackmon that they made to Gray; i.e., that the illegitimate daughter of

Andreae's deceased husband was challenging her inheritance, that $500 million in bearer bonds had been discovered in a Lichtenstein vault, and that $300 million in gold was found in India.  Id. ¶ 18.  By late 2009, Blackmon began to "have doubts" regarding the veracity of Defendants' representations.  Id. ¶ 21.  Blackmon eventually retained counsel in May 2011.  Given Decl. ¶ 3.

### B. PROCEDURAL HISTORY

On June 13, 2011, Plaintiffs filed their complaint in this Court which alleges fourteen claims for:  (1) fraud-intentional misrepresentation; (2) fraud-false promise; (3) fraud in the inducement; (4) conversion; (5) breach of oral, written and implied-in-fact contract; (6) breach of written contract-promissory note; (7) breach of oral, written and implied in fact contract; (8) violation of RICO; (9) conspiracy to violate RICO; (10) violation of unfair competition law; (11) imposition of constructive and/or resulting trust; (12) unjust enrichment; (13) injunctive relief; and (14) an accounting.  Plaintiffs seek general and punitive damages and other relief.

On June 13, 2011, Plaintiffs filed the instant action and ex parte application for a writ of attachment and TRO, without notice to Defendants.  Pursuant to California Code of Civil Procedure § 485.220, they seek an attachment in the amount of $6,111,834, which represents the loans made by Gray and Blackmon to Defendants.  Pls.' Mem. at 13-18.  In addition, Plaintiffs seek a TRO under Federal Rule of Civil Procedure 65 to "freeze" Defendants assets and to order them to produce records evidencing their holdings within and outside of California.  Id. at 18-19.

## II. LEGAL STANDARD

### A. EX PARTE WRIT OF ATTACHMENT

Federal Rule of Civil Procedure 64 provides, in relevant part, that "all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by *the law of the state in which the district court is held*...."  Fed. R. Civ. P. 64 (emphasis added).  Rule 64 thus "permits state seizure provisions to be used in

federal courts ...." Reebok Int'l v. Marnatech Enters., 970 F.2d 552, 558 (9th Cir. 1992). California Code of Civil Procedure § 485.220, which provides for the issuance of a prejudgment right to attach order on an ex parte basis, states:

> (a) The court shall examine the application and supporting affidavit and, except as provided in Section 486.030, shall issue a right to attach order, which shall state the amount to be secured by the attachment, and order a writ of attachment to be issued upon the filing of an undertaking as provided by Sections 489.210 and 489.220, if it finds all of the following:
>
> (1) The claim upon which the attachment is based is one upon which an attachment may be issued.
>
> (2) The plaintiff has established the probable validity of the claim upon which the attachment is based.
>
> (3) The attachment is not sought for a purpose other than the recovery upon the claim upon which the attachment is based.
>
> (4) The affidavit accompanying the application shows that the property sought to be attached, or the portion thereof to be specified in the writ, is not exempt from attachment.
>
> (5) *The plaintiff will suffer great or irreparable injury (within the meaning of Section 485.010) if issuance of the order is delayed until the matter can be heard on notice*.
>
> (6) The amount to be secured by the attachment is greater than zero.

Cal. Code. Civ. P. § 485.220(a) (emphasis added). Section 485.010(a) provides that "no right to attach order or writ of attachment may be issued pursuant to this chapter unless it appears from facts shown by affidavit that great or irreparable injury would result to the plaintiff if issuance of the order were delayed until the matter could be heard on notice. Cal. Code. Civ. P. § 485.010(a); see also Connecticut v. Doehr, 501 U.S. 1, 16 (1991) (recognizing that a prejudgment attachment without notice permissible only upon showing of exigent circumstances that would render property unavailable to satisfy a judgment).

### B.    TEMPORARY RESTRAINING ORDER

The standard for a TRO is the same as for a preliminary injunction. See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., 240 F.3d 832, 839 n.7 (9th Cir. 2001). To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of

success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in the favor of the moving party; and (4) that an injunction is in the public interest.  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, ---, 129 S.Ct. 365, 374-76 (2008).  The court may apply a sliding scale test, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another."  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).  A restraining order is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter, 129 S.Ct at 376.

A TRO may be issued without notice to the adverse party or its counsel only if "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  Fed. R. Civ. P. 65(b)(1); N.D. Cal. Civ. R. 65-1(b).  There are "very few circumstances justifying the issuance of an ex parte TRO."  Reno Air Racing Assoc. Inc. v. McCord, 452 F.3d 1126, 1131 (9th Cir. 2006).  For instance, notice may be excused where it "is impossible either because the identity of the adverse party is unknown or because a known party cannot be located in time for a hearing."  Id.  Or, notice may not be required where providing "notice to the defendant would render fruitless the further prosecution of the action" because the adverse party is likely to destroy evidence.  Id.

### III.     DISCUSSION

The threshold question presented is whether Plaintiffs may properly may obtain a writ of attachment and TRO without first providing notice to Defendants.  Both Rule 65(b)(1) and California Code of Civil Procedure § 485.010 require the submission of an affidavit which demonstrates that *immediate and irreparable* injury will occur if notice is given.  Plaintiffs fail to make such a showing.  In his declaration, Blackmon merely offers his opinion that Defendants will "hide or dissipate" their assets based on their "numerous

and repeated false statements," and prior remarks regarding hiding assets from the Swiss court and to avoid the payment of taxes.  Blackmon Decl. ¶ 23.  In addition, Andreae purportedly told Blackmon that if he "pressed [her] on legal matters, she would escape, just disappear or commit suicide."  Id. ¶ 24.  Gray makes essentially the same observations as Blackmon.  Gray Decl. ¶¶ 45-47.  However, there is no specific evidence presented that Defendants are likely to hide or dissipate their assets or records upon notice that Plaintiffs are seeking a writ of attachment and TRO.  Plaintiffs' speculation that Defendants will do so, based on their prior fraudulent conduct, is insufficient to justify dispensing with notice.  See Osborno v. Fong, No. C 11-0302 SBA, 2011 WL 250364, at *2 (N.D. Cal., Jan. 26, 2011) (denying TRO based on "Plaintiff's conclusory and unsupported allegation that notice of the instant TRO application will result in the further dissipation of trust assets"); Vaccaro v. Sparks, No. SACV 11-00164 DOC (PLAx), 2011 WL 772394, at *2 (C.D. Cal. Feb. 1, 2011) ("The fact that Defendants may have been engaged in some sort of fraud does not automatically justify the issuance of an asset freeze.").

      The Court's concerns regarding the issuance of a writ of attachment and TRO *without* notice are compounded by what appears to be Plaintiffs' extraordinary delay in seeking the instant relief.  See Miller ex rel. NLRB v. Cal. Pac. Med. Ctr., 991 F.2d 536, 544 (9th Cir. 1993) (noting that delay in seeking injunctive relief "implies a lack of urgency and irreparable harm.") (internal quotation marks and citation omitted); Lydo Enters. v. City of Las Vegas, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief.").  Here, the record shows that by late 2009, Blackmon had not been repaid any of the over $800,000 loaned to Defendants, and that at that point "[he] began to have serious doubts about the veracity of defendants' representations."  Blackmon Decl. ¶ 21.  Likewise, Gray, after loaning Defendants over $4.6 million and receiving serial excuses as to why he had not been repaid, began to question the validity of Defendants' representations.  Gray Decl. ¶¶ 38-39.  The record shows that beginning in 2008, Gray began complaining to Defendants regarding the delays in the Swiss court proceedings and their continuing failure

to provide documentation requested by Gray.  Id. ¶¶ 23-31.  As a result, "in or about 2010," Gray hired a private investigator, id. ¶ 39, and in July 2010, retained legal counsel, Givens Decl. ¶ 3.  Thus, it is evident from the record that both Plaintiffs suspected wrongdoing by Defendants years before they filed this suit and the accompanying request for a writ of attachment and TRO. Plaintiffs' delay in seeking legal relief undercuts their claim that they will suffer immediate and irreparable harm absent the issuance of a writ of attachment and TRO without notice.

## IV.  CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT Plaintiffs' ex parte application for a writ of attachment and temporary restraining order is DENIED without prejudice to seeking injunctive relief upon notice to Defendants.  This Order terminates Docket No. 4.

IT IS SO ORDERED.

Dated: June 16, 2011

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge